IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Daniel Horton,<br><br>　　　Plaintiff,<br><br>　　v.<br><br>Valerie Kidd, Mary Sperry, and The Board of Trustees of the University of Illinois,<br><br>　　　Defendants. | Case No. 3:18-cv-50291<br><br>Honorable Iain D. Johnston |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Daniel Horton was a pretrial detainee housed at the Winnebago County Jail for ten months. Invoking the Fourteenth Amendment, the Rehabilitation Act, and the Americans with Disabilities Act, Horton asserts that Defendants denied him access to enough sterile catheters.[1] After the government defendants settled, the remaining medical staff defendants moved for summary judgment. For the reasons explained below, that motion [136] is granted.

I.　　Background

In 2012, Plaintiff Daniel Horton was hit by a stray bullet and suffered a spinal cord injury that left him mostly paralyzed below his chest. Because of this injury, he is unable to control his bladder and must self-catheterize. Thus, he relies on the jail medical staff to supply him with an appropriate number of catheters.

---

[1] Horton was represented by assigned counsel. The Court thanks assigned counsel for their work on this matter.

1

This has led to prior lawsuits, which resulted in settlements. This action deals exclusively with Horton's pretrial incarceration at the Winnebago County Jail ("the jail") for ten months beginning July 2, 2018, until he was transferred to the Illinois Department of Corrections on April 26, 2019. Dkt. 108, ¶ 3. During that time, Horton was held in the Medical Unit Pod. Medical services at the jail are provided through a contract with the University of Illinois College of Medicine-Rockford. The Board of Trustees of the University of Illinois is the legal entity responsible for the College of Medicine, so it is the named defendant in this suit. Other than the Board of Trustees, Horton also sues two of its employees, nurses Mary Sperry and Valerie Kidd (formerly known as Valerie Lewis).

    Horton contends that the nursing staff failed to provide him with enough single-use catheters. The parties agree that Horton's injury left him unable to urinate normally or control his bladder. They agree that he needed to catheterize himself frequently, and that sometimes he accidentally urinated himself. Horton claimed he used eight or nine catheters per day, and that he was not permitted to keep a stash of catheters in his cell.[2] Instead, the nurses gave the correctional officers a supply of catheters to give to Horton when he needed them. Captain Timothy Owens testified that he told his staff to keep five catheters in the officers' desk in the medical housing unit. Because the officers' station is open and Horton's

---

[2] Though he was apparently not permitted to keep a full supply in his cell, the evidence suggests he was sometimes given multiple catheters. *E.g.*, Dkt. 140-5, at 4 (noting that the officer gave Horton two catheters); *id.* at 6 (noting that the officer gave Horton three catheters); *id.* at 10 ("I gave Inmate Daniel Horton 3 catheters, which leaves him with 2 left in the drawer."); *id.* at 25 ("During medpass, the nurse gave Horton 7 catheters.").

cell was only twenty feet away, Horton could shout and an officer would be able to hear him and respond. Although the officers kept the supply of catheters, Horton was expected to ask the nurses for more when his supply ran low. He asserts that he was often forced to go without new catheters because requests were not filled quickly enough by the nurses, and so he occasionally had to reuse old catheters.

Though Horton had seen Dr. Kenton Lee regarding his need to use catheters, no doctor's orders existed to regulate the number of catheters he was allowed to use each day. That decision was left up to each individual nurse. Rather than providing Horton with a set number each day, the nurses would bring him new catheters when he filed a request. Horton was expected to file a medical request himself when he needed new catheters, ask an officer to call the medical staff, or merely ask the nurses for additional catheters when they were in the pod during medical pass. To track the number of catheters that were issued to Horton, the medical staff created a catheter log, which documented the number of catheters checked out to either Horton or the officers in his Pod, who were responsible for providing the catheters to Horton when he needed them.

Dr. Lee believed that patients should not use more than four to six catheters each day, otherwise the patient may experience trauma to the urethra and urinary tract infections.[3] Thus, Dr. Lee believed that overuse beyond the four-to-six range was not an appropriate solution to Horton's needs. Nevertheless, Horton told Dr. Lee that he needed to use a catheter every two to three hours. Horton would also

---

[3] This is sometimes referred to as one catheter every four to six hours, instead of four to six each day. The math is the same either way.

wet himself after using a catheter, which Dr. Lee believed was a sign of bladder spasms. He diagnosed Horton with a neurogenic bladder with spasms and offered to prescribe an anticholinergic drug, which Horton declined.[4] Dr. Lee believed the spasms were causing Horton's increased catheter usage, so he referred Horton to a specialist. Notwithstanding the referral, Dr. Lee's diagnosis remained the same. On November 2, 2018, Dr. Lee recommended that Horton use a Foley indwelling catheter, which stays in place much longer and uses a bag. Dr. Lee had already suggested this treatment once before. Horton repeatedly declined to use the Foley catheter, even though Dr. Lee believed it provided a reasonable solution to prevent catheter overuse and Horton's accidental wettings.

Since filing this case, Horton and the government defendants settled. Thus, nurses Valerie Kidd and Mary Sperry, as well as the Board of Trustees of the University of Illinois, are the only remaining defendants. In Count II, Horton brings a claim against the two nurses in their individual capacities for purportedly failing to provide him with constitutionally adequate medical care. In Count IV, Horton brings a claim against the Board to Trustees under the Americans with Disabilities Act and the Rehabilitation Act. These three defendants now move for summary judgment.

## II.     Analysis

On summary judgment, the movant has the burden of showing that "no genuine dispute as to any material fact" exists and that it is "entitled to judgment

---

[4] Anticholinergic drugs "can help reduce the incontinence by reducing the bladder spasms and the urgency of the sensation to urinate." Dkt. 146, ¶ 62.

as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that might affect the outcome of the suit. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). No "genuine" dispute exists if a court would be required to grant a Rule 50 motion at trial. *Id.* at 250–51. The Court must construe the "evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008). "Summary judgment is only warranted if, after doing so, [the Court] determine[s] that no jury could reasonably find in the nonmoving party's favor." *Blasius v. Angel Auto, Inc.*, 839 F.3d 639, 644 (7th Cir. 2016).

### A. Exhaustion

Sperry and Kidd argue that they are entitled to summary judgment because Horton failed to first exhaust his administrative remedies. The Prison Litigation Reform Act (PLRA) requires exhaustion of available administrative remedies before filing suit: "No action shall be brought with respect to prison conditions . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Because Horton was detained in the Winnebago County Jail as a pretrial detainee, he must satisfy the PLRA's exhaustion requirement.[5] Failure to exhaust is an affirmative defense, so defendants bear the burden of establishing that the plaintiff

---

[5] Under the PLRA, a prisoner is defined as "any person incarcerated *or detained* in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h) (emphasis added). Thus, the plain text of the PLRA clarifies that it applies to pretrial detainees.

did not exhausted available administrative remedies. *Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016).

"Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Crouch v. Brown*, 27 F.4th 1315, 1320 (7th Cir. 2022) (quoting *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006)). And detainees must strictly comply with the exhaustion process. *Id.* (quoting *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006)). But detainees need not exhaust remedies that are effectively unavailable, (e.g., when those remedies "operate[] as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"). *Id.* (quoting *Ross v. Blake*, 578 U.S. 632, 643 (2016)). The procedures necessary to exhaust administrative remedies are not found in the PLRA. Rather, the detainee must follow the procedures established by the jail itself. *Jones v. Bock*, 549 U.S. 199, 218 (2007) ("The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."). And though each step in the process must be followed, the jail cannot require detainees to include information not required in the procedures. *See id.* ("As MDOC's procedures make no mention of naming particular officials, the Sixth Circuit's rule imposing such a prerequisite to proper exhaustion is unwarranted.");

6

*Ford v. Johnson*, 362 F.3d 395, 397 (7th Cir. 2004) (requiring adherence to every step "prescribed by the prison's grievance system").

Detainees at the jail are informed about the procedure for filing grievances during the intake process. The process is also detailed in the inmate handbook. In April 2012, the jail moved to a computerized system that allowed inmates and detainees to file grievances and appeals electronically through kiosks located in each pod. Later (and during the relevant period), the jail issued the inmates and detainees tablets on which they could submit grievances and appeals, as well as view the grievance procedure in the handbook. The jail also periodically displayed the grievance procedure on televisions screens in each pod. Furthermore, once submitted, the grievances and appeals were automatically entered into the computer system, which does not permit deletion by anyone at the jail. When detainees have a complaint regarding the conditions of their confinement, including medical care, they first attempt to resolve those complaints informally. If that doesn't solve the problem, then the detainees file a grievance on the kiosk or their tablet. If the response to the grievance doesn't adequately solve the problem, then the detainees may appeal the decision using their tablets.

Horton undisputedly filed a multitude of grievance. When faced with an adverse response, he sometimes appealed. Other times, he didn't. Horton named nurses Sperry and Kidd in several of those grievances. They argue, however, that although Horton was fully aware of how the grievance process worked, he never appealed any grievances related to their conduct, though he did appeal other

7

adverse decisions not related to the nurses' conduct.[6] Dkt. 139, at 9–10. In response, Horton summarily argues that the Court should not strictly enforce the exhaustion requirement because (1) he did file and appeal grievance 6927, which generally complained about the actions of the medical staff throughout his time at the jail; and (2) his attempts at appeal were frustrated by "issues with the system." Dkt. 145, at 21.

The Court need not consider Horton's second argument because his appeal of grievance 6927 (as well as other earlier general grievances) properly exhausted his administrative remedies. In reply, Sperry and Kidd cite *Roberts v. Neal*, 745 F.3d 232, 235–36 (7th Cir. 2014) for the proposition that Horton was required to name them in his grievance. On their theory, he can only invoke the grievances in which he personally named them, and because he didn't appeal those grievances, he did not exhaust his available remedies. The argument misses the mark, however, because that case involved the administrative procedure used by the Illinois Department of Corrections and not the Winnebago County Jail. *Id.* at 235. In *Jones v. Bock*, the Supreme Court struck down a rule in the Sixth Circuit that required the inmate or detainee to have specifically named a defendant in the grievance. 549 U.S. 199, 217 (2007). The Court explained that the prison's grievance procedure did not require inmates to name specific individuals, and the requirements to exhaust remedies will vary from facility to facility because each facility sets the procedure,

---

[6] Defendants contend that Horton named Sperry in seven grievances: grievance numbers 672202, 673097, 677990, 686845, 686907, 687257, and 699252. They also contend that he named Kidd in seven grievances: grievance numbers 680286–88, 686907, 690510, 703228, and 2589. Dkt. 139, at 9.

not the PLRA. *Id.* at 218. And the Seventh Circuit, citing *Jones v. Bock*, recently reiterated this rule that prisoners are only required to cite specific names if the facility's procedures require it. *Henry v. Deshler*, No. 20-2185, 2021 U.S. App. LEXIS 20225, at *5–6 (7th Cir. July 8, 2021).

In this case, the Winnebago County Jail's procedures do not require detainees to specifically name anyone. The procedure merely requires that prisoners first seek to resolve the matter informally, then file a grievance using the kiosk or tablet, and then appeal any adverse decision. Dkt. 140-7, ¶ 12. And although Sperry and Kidd never attached the full text of the grievance process, it can be found in the detainee handbook on the Winnebago County Sheriff's Department official webpage. The inmate handbook indicates that inmates are expected to include "a thorough explanation of the problem and relief sought," but the procedure does not require specific names. Winnebago County Sheriff's Office Corrections Bureau, *Inmate Handbook*, https://winnebagosheriff.com/file_library/file-13-05fda6405c3b592.01838449.pdf; *see also Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (judicial notice of official government websites is proper).[7]

Horton filed grievance 6927 on March 30, 2019, complaining that he was not being given enough catheters. He complained that this caused him to urinate on

---

[7] Though the version of the inmate handbook on the Winnebago County Sheriff's Department webpage was revised in 2020, the relevant section has not changed. *See Marks v. Aramark Inc.*, No. 18-cv-50232, 2019 U.S. Dist. LEXIS 229256, at 3 (N.D. Ill. Nov. 27, 2019) (report and recommendation adopted by 2020 U.S. Dist. LEXIS 40142 (N.D. Ill. Mar. 9, 2020)). Nor has the jail's prior procedures required inmates to include names. *See Schaefer v. Spates*, No. 16-cv-50377, 2018 U.S. Dist. LEXIS 68757, at *4 (N.D. Ill. Mar. 19, 2018) (report and recommendation adopted by 2018 U.S. Dist. LEXIS 68212 (N.D. Ill. April 24, 2018)).

himself, that he wasn't always given fresh pants to wear, and that it caused embarrassment. Dkt. 140-8, at 14. That grievance was appealed and denied because staff believed they were giving him enough catheters. *Id.* Thus, Horton exhausted his administrative remedies by following the jail's procedure and placing it on notice of the complaint. And regardless of whether Horton named specific people in grievance 6927, the jail responded to the merits of the grievance, thereby negating the need to name names. *Maddox v. Love*, 655 F.3d 709, 722 (7th Cir. 2011).

### B. Fourteenth Amendment

In Count II, Horton sues nurses Sperry and Kidd under 42 U.S.C. § 1983. Because he was a pretrial detainee and not an inmate, his claim for inadequate medical care arises under the Fourteenth Amendment. *Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019). Under the Fourteenth Amendment, pretrial detainees must show that the challenged conduct was "objectively unreasonable." *Id.* That presents a two-part test.[8] First, the court must consider whether the defendants acted purposely, knowingly, or recklessly. *McCann v. Ogle County*, 909 F.3d 881, 886 (7th Cir. 2018) But negligence, or even gross negligence, is not enough to satisfy this requirement. *Id.*; *see also Kemp v. Fulton County*, 27 F.4th 491, 495–96 (7th Cir. 2022) (reiterating that negligence is not enough). Second, the court looks at the totality of the circumstances and considers whether the challenged conduct was

---

[8] Though some view this as a three-part test that first addresses whether the plaintiff suffers a serious medical condition, *see Hardeman v. Curran*, 933 F.3d 816, 827 (7th Cir. 2019) (Sykes J., concurring), binding precedent includes only two elements. *See Pittman v. County of Madison*, 970 F.3d 823, 827 (7th Cir. 2020); *James v. Hale*, 959 F.3d 307, 318 (7th Cir. 2020); *Turner v. Paul*, 953 F.3d 1011, 1015 (7th Cir. 2020); *McCann*, 909 F.3d at 886.

10

objectively reasonable. *McCann*, 909F.3d at 886; *Williams*, 937 F.3d at 942–43. Horton cannot establish the second or third elements.[9]

Nothing in the record establishes that Sperry and Kidd purposely, knowingly, or recklessly deprived Horton of a sufficient number of catheters. Instead, they denied his request for new catheters because they believed he had enough, based on the medical opinions that he should be using one catheter every four to six hours. Similarly, in *McCann v. Ogle County*, the Seventh Circuit held that a nurse had not acted purposely, knowingly, or reckless by administering dangerous doses of methadone. 909 F.3d 881, 886–87 (7th Cir. 2018). In that case, the nurse had administered the doses based on the doctor's orders. Although her actions were intentional and deliberate, the court explained that "nothing shows that she foresaw or ignored the potential consequences of her actions—McCann's dying from the over-prescription of methadone." *Id.* at 887. The same is true in this case. Nothing indicates that Sperry and Kidd foresaw or ignored the potential consequences of their actions. Indeed, the record indicates that they believed the overuse of catheters was medically inappropriate.

---

[9] Beyond the objectively unreasonable standard, Sperry and Kidd argue that Horton has not established that they were personally involved in any constitutional violation or that their conduct caused any constitutional injury. Dkt. 139, at 11, 19. Indeed, both are requirements of Horton's individual capacity suit. *Hoffman v. Knoebel*, 894 F.3d 836, 841 (7th Cir. 2018) ("In other words, the official's act must both be the cause-in-fact of the injury and its proximate cause."); *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) (personal involvement required for individual capacity § 1983 suits); *Grieveson v. Anderson*, 538 F.3d 763, 778 (7th Cir. 2008) (same). The Court need not address these arguments, however, because Horton's claim must fail regardless.

11

Next, Sperry's and Kidd's conduct was objectively reasonable. Objective reasonableness "turns on the facts and circumstances of each particular case." *Mays v. Dart*, 974 F.3d 810, 819 (7th Cir. 2020). Sperry and Kidd had a multitude of duties and other inmates that had their own medical needs. Sperry and Kidd needed to allocate their time among all their patients, and sometimes that meant they would be busy conducting medical pass and medication distribution and would not be available to bring fresh catheters to Horton on a moment's notice. Dkt. 146, ¶ 53. So, they repeatedly told him to ask for new ones when they were in the pod and before he ran out. *E.g.*, *id.* ¶ 35. And the jail attempted to ease any difficulty in juggling the needs of all inmates by keeping some spare catheters in the pod officers' desk.[10] When Sperry and Kidd were asked for additional catheters, they appear to have brought new catheters as soon as they could, at least when they believed that Horton needed them.[11] Horton's belief that he should have received new catheters immediately any time he requested them does not account for the circumstances Sperry and Kidd faced as well as the medical opinions. So, Horton's grievance was denied because he had already been issued the safe number of catheters.[12] Sperry and Kidd believed that any more would amount to overuse,

---

[10] Dkt. 140-10, at 13 (discussing that nurses can't always get back to the cell immediately and keeping spare catheters in the pod officers' desk eased the burden).
[11] *See* dkt. 140-9, at 12 (discussing that when Horton requested catheters, the nurse would look to see how many he had left before weighing whether she needed to get one immediately or whether she could attend to her other duties first).
[12] For example, in grievance 2589, Horton complains that he asked Kidd for a new catheter at 8 p.m. and that she refused to give him any additional catheters because he had two in reserve. The response to the grievance explained that if he had two in reserve then he did not need any additional catheters because he should only be using one every four to six hours. Dkt. 140-8, at 6.

which the nurses viewed as medically inappropriate—a belief supported by the unrebutted medical opinion of Dr. Lee.[13] Dkt. 140-11, ¶¶ 10–11 (explaining that bleeding and increased risk of infection are concerns presented by patients overusing catheters).

Therefore, because Horton cannot establish either the second or the third element of the objectively unreasonable test, Nurse Sperry and Nurse Kidd are entitled to judgment as a matter of law.

### C. Americans with Disabilities Act and the Rehabilitation Act

Horton brings claims under the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA) against the Board of Trustees of the University of Illinois. The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The RA similarly prohibits discrimination in programs receiving federal funding: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance

---

[13] Other times, he had problems getting a catheter because he refused to get out of bed for medical pass to request them. *E.g.*, Dkt. 140-5, at 4 ("Inmate was unable to request a catheter from the nurse due to not getting out of bed."). Even in the cited incident, the nurse later came back to the pod and brought him catheters even though he refused to properly request them during medical pass. *Id.*; *see also id.* at 5 ("Horton requested catheters after the nurse had just left the pod. He knew that she was coming over for him and chose to not ask for them before she came over, he waited until she left to ask for them. Medical was advised.").

13

or under any program or activity conducted by any Executive agency or by the United States Postal Service." 29 U.S.C. § 794.

To prove a claim under the ADA and RA, a plaintiff must establish (1) that the plaintiff is a qualified individual with a disability (2) that the plaintiff was denied the benefits of the services, programs, or activities of the defendant public entity, and (3) that exclusion occurred because of the disability. *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015). This test applies to claims under both the ADA and the RA, with one exception: the RA requires a higher showing of causation. The plain text of the RA requires that the discrimination occur *solely* because of the disability, while the ADA "requires only that the plaintiff's disability be *a* reason for the challenged action." *Conners v. Wilkie*, 984 F.3d 1255, 1260 (7th Cir. 2021) (emphasis in original). Furthermore, these statutes do not provide a remedy for medical malpractice. *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996).

The Board of Trustees moves for summary judgment on two theories: (1) sovereign immunity, and (2) causation. Dkt. 139, at 33–34. Because the evidence does not establish any causal connection, however, the Court need not address the question of whether the Eleventh Amendment protects the Board of Trustees under these circumstances. Indeed, because the RA requires sole causation, rather than merely partial causation, establishing a lack of causation under the ADA necessarily defeats causation under the RA.

14

The Board of Trustees argues that Horton has not supplied any evidence that he was deprived access to catheters based on his disability. Dkt. 139, at 35. The Board of Trustees further argues that any limitation on Horton's access to single-use catheters was a medical decision, and thus not a decision based on discrimination. *Id.* at 35–36. Horton responds by asserting that his new facility handles catheter disbursement differently and that the jail's "haphazard, ad hoc system" often meant that Horton was left without access to basic restroom needs. Dkt. 145, at 14. Horton's argument effectively amounts to a contention that because the system in place sometimes led to Horton being without a fresh catheter, the evidence is sufficient to allow the question of causation to reach a jury. *Id.* at 14–19 ("Plaintiff's bathroom use was heavily scrutinized, monitored, and disrupted by the Defendant in ways that were not done for able-bodied detainees.").

Horton's argument in response misses the mark for two reasons. First, the claim before the Court is against the medical provider; Horton already settled his claims against the jail and its staff. And the evidence shows that the jail, not the medical provider, was responsible for the decision to keep catheters in pod officers' desk rather than to allow Horton to keep them all in his cell. The record contains no evidence that this allegedly "haphazard, ad hoc system" was implemented by the Board of Trustees.[14]

---

[14] The nurses were responsible for bringing catheters to the pod officer's desk, but Captain Owens instructed the officers to keep catheters in the desk to accommodate Horton's needs in a more timely manner. Dkt. 146, ¶ 84. Nurse Valerie Lewis Kidd testified that corrections staff were responsible for deciding how many catheters an inmate could keep in his cell, not medical staff. Dkt. 140-9, at 10. And Captain Owens testified that corrections staff did not have a specific limit on how many catheters Horton could keep in his cell. Dkt.

Second, the evidence also establishes that the nurses routinely informed Horton that he should not be using catheters as frequently. When he submitted grievances complaining that they didn't bring him a new catheter quickly enough, the medical staff often reminded him not to use them more than once every four to six hours.[15] Indeed, Dr. Lee testified that frequently using catheters in the way Horton could cause negative medical consequences. Dkt. 146, ¶ 68. Dr. Lee offered Horton the option of a more permanent catheter solution that would obviate the need for single-use catheters. But Horton refused the treatment. *Id.* ¶ 66. Dr. Lee also offered Horton a medication that would lessen his need for such frequent urination. Horton again declined the offered treatment. *Id.* ¶¶ 61–62.

The record contains no evidence that the medical staff failed to supply Horton with enough catheters because of his disability. On the contrary, the evidence shows that Horton needed single-use catheters because he declined the indwelling catheter, and he refused the medication Dr. Lee prescribed. The record also shows that the nursing staff provided Horton with a significant number of catheters, but sometimes declined his request for more *because* of the medical opinion that he

---

140-10, at 41–42. He further explained that the reason for keeping extra catheters at the pod officers' desk was out of frustration by the nursing staff that they couldn't keep Horton happy because they had other duties to attend to. So, extra catheters were kept at the pod officers' desk to help alleviate the burden on the nursing staff. *Id.* at 13–14.

[15] *E.g.*, Grievances 1992, 1995, 2589, and 7257. Dkt. 140-8. And Horton admitted in his deposition that the medical staff had told him this since the beginning. Dkt. 140-1, at 10 ("They have been using 'four to six hours' since day one, from the first day I got shot."); Dkt. 140-2, at 20 ("Q. And I don't want to go through every single instance where this is in the records, but she indicated that you are supposed to catheterize yourself every four to six hours. Is that something that they would tell you from time to time? A. Yes. She told me that all the time. Q. She told you that all the time. A. Yes, and other nurses and whoever else respond to grievances, they told me that numerous times.").

should not use more than one every four to six hours. Notwithstanding that Dr. Lee had never issued a written order disallowing more frequent use, the nurses denied Horton's request because of the need to avoid overuse. If their reasoning was wrong, it still was not based on Horton's disability. *Shaw v. Kemper*, 2021 U.S. Dist. LEXIS 61656, at *16 (E.D. Wis. Mar. 31, 2021); *Velazquez v. Williams*, 2015 U.S. Dist. LEXIS 84464, at *12 (N.D. Ill. June 30, 2015); *accord Burger v. Bloomberg*, 418 F.3d 882, 883 (8th Cir. 2005). Moreover, even if relying on a medical opinion without the existence of a written order amounted to negligence, the ADA and the RA do not provide a remedy for such negligence. *Bryant*, 84 F.3d at 249. Indeed, the knowledge requirement to prove a case under the ADA and RA is deliberate indifference. *Lacy v. Cook County*, 897 F.3d 847, 862–63 (7th Cir. 2018).

Because no reasonable jury could conclude, based on the evidence in the record, that Horton was deprived additional catheters because of his disability, the Board of Trustees is entitled to summary judgment.

### III. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment [136] is granted. Civil case terminated.

Date: April 21, 2022

_____
Honorable Iain D. Johnston
United States District Judge